**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Susana Villanueva Garcia, et al., | No. CV-20-00220-PHX-MTL |
| Plaintiffs, | **ORDER** |
| v. | |
| United States of America, | |
| Defendant. | |

Before the Court is Defendant United States of America's ("United States") Motion to Dismiss for Lack of Subject Matter Jurisdiction (the "Motion") (Doc. 20). This Motion was discussed at oral argument. The Court resolves the Motion as follows.

## I.    BACKGROUND

This case involves tragic facts. In June 2017, the Highline Fire burned over 7,000 acres of land near Payson, Arizona. (Doc. 17 ¶¶ 20–21.) This fire incinerated vegetation and trees on national forest land in the Mongollon Rim area. (*Id.* ¶ 21.) More than 900 firefighters battled the Highline Fire. (*Id.* ¶ 22.) The Highline Fire specifically hit the Ellison Creek watershed, which is part of the Tonto National Forest. (*Id.* ¶¶ 24–25.) Many adjoining waterways that were impacted by the fire fed into Ellison Creek, which in turn would then flow downstream "into the public recreation areas along it." (*Id.* ¶ 26.) "One such public recreation area is the Water Wheel area, a popular and easily-accessed hiking and swimming area with waterfalls, a swimming hole, large boulders, and sheer canyon walls." (*Id.* ¶ 27.)

As the fire raged, the United States Forest Service (the "Forest Service") assembled an interdisciplinary Burned Area Emergency Response ("BAER") team, "whose purpose was to assess risks to life, property, and natural and cultural resources and to recommend emergency response actions to reduce the anticipated consequences of those risks." (*Id.* ¶ 31.) The Forest Service issued an order closing the Highline Trail from Dry Dude Creek to Ellison Creek on June 23, 2017. (Doc. 23-7 at 2.) The purpose of this order was, in part, to protect the public's health and safety from flash flooding. (*Id.*) A Forest Service hydrologist released a Water Resources Specialist Report (the "Water Report") on July 2, 2017. (Doc. 20-5 at 15.) The Water Report sought to identify certain post-wildfire threats and to suggest "treatments to prevent, mitigate or reduce the severity of the threats." (*Id.*) After considering many factors, such as watershed conditions and pre- and post-fire peak flows, the Water Report observed that the "first few high intensity storms following the fire pose the greatest flash flood hazard to downstream areas." (*Id.* at 18–19.) The Water Report concluded with an "Emergency Determination," which noted "[t]hreats to downstream life and property from post-fire watershed conditions" and "[t]hreats to life and safety on the Highline and Myrtle trails that pass through and below the burdened area from flash flooding." (*Id.* at 21.)

After the fire was contained, on July 6, 2017, the BAER team completed its initial and interim reports (collectively, the "BAER Report"). (*Id.* at 25–45.) The BAER Report outlined many things, including critical threats, emergency treatment objectives, and probabilities of treatment success. (*Id.*) This assessment noted two debris jams on Ellison Creek toward the Highline Trail and three to four other debris jams in another creek. (*Id.* at 5.) The BAER Report requested funding "for estimated emergency stabilization funds." (*Id.* at 25.) This included funding for two additional flash flood warning signs for a road approximately seven miles from Cold Springs. (*Id.* at 3, 7–8.) This assessment did not recommend closing national forest lands that included the Water Wheel site or Cold Springs. (Doc. 15-2 ¶ 26.)

On July 15, 2017, the Garcia and Garnica families decided to celebrate a birthday

by swimming near the Water Wheel recreational site at the Cold Springs. (Doc. 17 ¶ 40.) Several members of those families arrived at the Water Wheel parking lot in three separate vehicles. (*Id.* ¶¶ 41–42.) The Forest Service charged $9.00 per vehicle for visitors to use the Water Wheel recreation area. (*Id.* ¶ 43.) Somebody in the group paid a total of $27.00 by depositing that amount "in a designated drop box." (*Id.* ¶¶ 44–46.)

There were no specific flash flood warning signs at the Water Wheel site.[1] (*Id.* ¶¶ 49, 51.) There were signs at a kiosk which contained warnings to swim "AT YOUR OWN RISK" and to "[b]e aware of changing weather conditions." (*Id.* ¶ 50; Doc. 20-6 at 7, 9.) All the family members hiked to, and swam at, the Cold Springs swimming hole. (Doc. 17 ¶ 52.) Everyone was unaware of the heavy rains that began to fall eight miles upstream. (*Id.*)

At 1:45 PM, the National Weather Service ("NWS") dispatched a flash flood warning for the region that includes the Cold Springs swimming hole. (*Id.* ¶ 53.) "Many people, including the Garcia family, remained in the Water Wheel area, apparently unaware" of the flash flood alert. (*Id.* ¶ 55.) Then, "[w]ithout warning, a black wall of water, logs, rocks, mud, and debris descended on the Water Wheel area, moving far too fast for those in its path to escape." (*Id.* ¶ 56.) Although a few people "were able to grab onto trees or rocks and make their way to safety," a total of ten people "were swept away by the wall of debris and died in the flood." (*Id.* ¶¶ 57–59.) The Forest Service closed this area after the flood. (*Id.* ¶ 61.)

Plaintiffs Susana Villanueva Garcia and her brother, Julio Cesar Garcia, (collectively, the "Garcias" or "Plaintiffs") brought this action against the United States. (Doc. 17.) Ms. Villanueva Garcia also brings this action on behalf of all statutory beneficiaries of Selia Garcia Castaneda, her mother, and J.L.V., her daughter. (*Id.*)

## II.   LEGAL STANDARD

This case involves tort claims against the federal government. Accordingly, the Federal Tort Claims Act ("FTCA") governs the issues presented. Motions to dismiss

---

[1] The Forest Service posted two "Flash Flood Area" signs on roads leading to the Water Wheel recreational area, but no flash flood hazard signs at the site itself. (Doc. 20-6 at 3.)

based on an exception to the FTCA's waiver of sovereign immunity are treated as motions to dismiss for lack of subject matter jurisdiction and reviewed under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988) ("The question whether the United States has waived its sovereign immunity against suits for damages is, in the first instance, a question of subject matter jurisdiction."). While the plaintiff has the burden of showing that it has alleged facts within the FTCA's waiver of immunity, the United States bears the burden of proving the applicability of an exception to the waiver of immunity under the FTCA. *Bailey v. United States*, 623 F.3d 855, 859 (9th Cir. 2010); *Prescott v. United States*, 973 F.2d 696, 701–02 (9th Cir. 1992).

## III.    DISCUSSION

The Garcias assert two causes of action under the FTCA: (1) negligence/gross negligence and (2) wrongful death. (Doc. 17 ¶¶ 68–85.) The Garcias allege that the United States is liable under four separate negligence theories: (1) "[f]ailing to warn individuals in the Water Wheel area of the potential for flash floods, including by posting appropriate signs at the Water Wheel parking lot and/or the adjacent trailhead;" (2) "[f]ailing to warn individuals in the Water Wheel area of the NWS flood alert that was issued on July 15, 2017;" (3) "[f]ailing to close the Water Wheel area to the public after the NWS flood alert was issued on July 15, 2017;"[2] and (4) "[f]ailing to take reasonable steps, such as removing floatable debris, to mitigate the danger posed by the residual effects of the Highline Fire in Ellison Creek." (*Id.* ¶ 74.) The United States argues that the FTCA's discretionary function exception bars the Garcias' first negligence theory, failing to place appropriate flash floods signs. (Doc. 20 at 3–8.) The United States also contends that all of the Garcias' negligence theories fail under the FTCA's private party analogue requirement because their simple and gross negligence claims are barred by Arizona's recreational use statute. (*Id.* at 8–17.)

---

[2] As the United States noted at oral argument, the Garcias' First Amended Complaint does not make clear whether the Garcias third theory of negligence includes the failure to close the Water Wheel area to the public after the Highline Fire, as opposed to closing it after the NWS flood alert.

The United States enjoys sovereign immunity; it cannot be sued without its consent and such consent is a prerequisite for jurisdiction. *Conrad v. United States*, 447 F.3d 760, 764 (9th Cir. 2006). The FTCA "constitutes a limited waiver of that immunity." *LaBarge v. Mariposa Cnty.*, 798 F.2d 364, 366 (9th Cir. 1986). In one instance, the FTCA waives sovereign immunity "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also* 28 U.S.C. § 2674 ("The United States shall be liable . . . relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . ."). "The FTCA's broad waiver of sovereign immunity is subject to a number of exceptions, including the discretionary function exception." *Nanouk v. United States*, 974 F.3d 941, 944 (9th Cir. 2020). This statutory exception preserves the United States' sovereign immunity for any claim based on a discretionary function. *See* 28 U.S.C. § 2680(a). The United States argues that both the existence of a discretionary function and a private party analogue that shields it from liability and amounts to two jurisdictional hurdles that the Garcias cannot overcome. The Court will address each argument in turn.

## A.   Discretionary Function Exception

Courts follow a two-step test to determine whether the discretionary function exception applies. First, courts ask whether the challenged act or omission was a discretionary one—that is, whether it "involve[d] an element of judgment or choice." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). The discretionary function exception does not apply when an applicable "statute, regulation, or policy specifically prescribes a course of action." *Id.* "If the act did not involve an element of judgment or choice, the analysis ends there and the plaintiff's claim may proceed." *Nanouk*, 974 F.3d at 945.

If the government's conduct involved an element of judgment or choice, a court must then ask whether the discretionary decision "is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. "The decision

must be one that is grounded in social, economic, and political policy." *Young v. United States*, 769 F.3d 1047, 1053 (9th Cir. 2014). The government prevails at step two if it can show that the challenged decision is "susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325 (1991). The Ninth Circuit has acknowledged the "weaving lines of precedent regarding what decisions" are discretionary in nature, particularly when the allegation of agency wrongdoing involves a failure to warn. *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005). Courts have noted that "[g]overnment actions can be classified along a spectrum, ranging from those 'totally divorced from the sphere of policy analysis,' such as driving a car, to those 'fully grounded in regulatory policy,' such as the regulation and oversight of a bank." *Id.* (quoting *O'Toole v. United States*, 295 F.3d 1029, 1035 (9th Cir. 2002)).

### 1.    Discretionary or Mandated Act

The United States first argues that "there was no specific and mandatory federal statute, regulation or policy that mandated the placement of additional or more specific flash flood warning signs or posters at the Water Wheel Parking Lot and/or adjacent trailhead." (Doc. 20 at 4.) The United States points to Forest Service manuals and Sign and Poster Guidelines (the "Guidelines") to show that the language therein "are not regulations or mandates." (*Id.* at 5.) The Garcias respond by arguing that the Guidelines' applicable language gives the United States "no choice but to coordinate the development of appropriate warning signs to mitigate the hazard." (Doc. 23 at 6–7.) The Court finds the United States' argument more persuasive.

Discretion was conferred upon the Forest Service both explicitly and implicitly. Discretion was conferred explicitly through use of the permissive term "should." *See Sabow v. United States*, 93 F.3d 1445, 1452 (9th Cir. 1996) (describing "should" as "suggestive, not mandatory") (citation omitted); *Marshall v. Anaconda Co.*, 596 F.2d 370, 375 (9th Cir. 1979) (noting that the "'[s]hould . . . unless' language is clearly [m]ore advisory"). Section 7.7 of the Guidelines concerns flash flood hazard site signage at developed recreational sites. (Doc. 20-4 at 70.) This section provides:

1
2
3
4
5
6

> The Flash Flood Hazard site sign or poster . . . *should* be posted at all developed recreation sites that the Forest Service has determined are vulnerable to flash flooding. Hydrologists and recreation managers *should* advise on the need for Flash Flood Hazard site signs or posters. Flash flood hazard site signs or posters *should* be posted on information boards and/or at other prominent locations so that the signs are likely to be seen by all visitors.

7
8
9

(*Id.* (emphasis added).) "Should" is defined as: "guidance for a recommended but not mandatory practice with deviations allowed where engineering judgment or engineering study indicate a deviation is appropriate."[3] (*Id.* at 30.)

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

    The Garcias contend the Guidelines mandate that the Forest Service post flash flood hazard signs in vulnerable areas "*unless* an 'engineering judgment or engineering study' has indicated that a deviation is appropriate." (Doc. 23 at 6–7 (emphasis in original).) This argument side-steps the fact that the Forest Service's decision to place flash flood signs is still discretionary. The Guidelines and its definitions make clear that this is only guidance or a recommendation. The Garcias' reading of the Guidelines is misplaced because Forest Service officials evaluate several discretionary factors when determining to put flash flood signs in certain locations. (Doc. 20-4 at 4–5.) Focusing on the "engineering judgment or engineering study" language does not aid the Garcias' argument because no facts suggest that such a judgment or study mandated that the Forest Service place flash flood signs at the Water Wheel site. As the United States points out, the Garcias' argument also overlooks the definition's final sentence, which states that "should" is equal to "guidance." (Doc. 24 at 3.) The Garcias point to another paragraph in Section 7.7 of the Guidelines to argue that the Forest Service is mandated to coordinate the development of signs to "mitigate specific hazards."[4] (*Id.* at 7.) This argument fails

25
26
27
28

---

[3] This definition also states that in the Manual on Uniform Control Devices, which is the "national standard for all traffic control devices," "'should' is equal to 'guidance.'" (*Id.* at 22, 30.) The Forest Service has adopted this manual. (*Id.* at 22.)

[4] This paragraph reads: "Coordinate with the regional sign coordinator and appropriate regional office recreation staff if new signs or posters need to be developed to mitigate specific hazards. Regional supplements may be developed as necessary to respond to specific situations or conditions or to insure consistency across a region." (*Id.* at 68.)

for two reasons. First, this paragraph contains a passive term, "may." *See Kingdomware Technologies, Inc. v. United States*, 579 U.S. ——, 136 S. Ct. 1969, 1977 (2016) ("[T]he word 'may' . . . implies discretion . . . ."). This paragraph also does not mention that coordination to implement new signs or posters is mandatory in any way. Indeed, this paragraph implies that coordination to develop new signs is a discretionary process that only needs to be done when presented with specific situations or hazards. (*See* Doc. 20-4 at 68.)

Discretion was also conferred on the Forest Service's decisions implicitly through the embedding of discretionary choices throughout the policies. *See Gonzalez v. United States*, 814 F.3d 1022, 1029 (9th Cir. 2016) ("Courts have consistently held that where, as here, a government agent's performance of an obligation requires that agent to make judgment calls, the discretionary function exception applies."). As the Forest Service's Director of Recreation, Heritage, and Wilderness Resources, Chris Hartman, indicates, the Guidelines "has always been interpreted as necessitating a discretionary decision on the need to post flash flood hazard site signs or posters." (Doc. 20-4 at 4.) Mr. Hartman further stated that he has never interpreted the Guidelines "as imposing a mandatory duty on the Forest Service to post warning signs and posts at all parking lots or trailheads." (*Id.*) Indeed, these decisions depend on several discretionary factors. (*Id.* at 4–5.) The challenged act therefore involves an element of judgment or choice.

### 2.     Susceptible to Policy Analysis

The Court must now determine whether the Forest Service's discretionary decision is "one that is grounded in social, economic, and political policy." *Young*, 769 F.3d at 1053. The United States argues that its decision regarding sign and poster placement and wording are susceptible to policy analysis. (Doc. 20 at 5–6.) The United States provides that Congress has mandated that the Forest Service is a "multiple use" organization to show this decision is grounded in social and political policy. (*Id.* at 6 (citing 16 U.S.C. § 531).) The United States also contends that its "decisions how to allocate funding and human resources among competing priorities necessarily implicate economic policy."

(*Id.*) Finally, the United States argues that "there can be no question here that the challenged decision not to install additional signage involved balancing competing policy priorities based on several discretionary factors," such as harms with the proliferation of signage and the sheer number of trailheads and developed recreational sites to manage. (*Id.* at 6–8.) The Garcias respond by saying that a "decision not to warn of a specific, known hazard . . . is not the kind of broader social, economic or political policy that the discretionary function exception is intended to protect." (Doc. 23 at 7–8 (quoting *Sutton v. Earles*, 26 F.3d 903, 910 (9th Cir. 1994)).) The Garcias argue that the Forest Service knew of potential flash flooding risks at Cold Springs and the failure to warn of that specific hazard "did not involve any social, economic, or political consideration." (*Id.* at 9–10.)

The Garcias cite *Kim v. United States*, 940 F.3d 484 (9th Cir. 2019), to support their position. (*Id.* at 8.) In *Kim*, two children were killed after a tree limb fell on their tent while camping at Yosemite National Park. 940 F.3d at 486. Park policies established a "Hazard Tree Management" program, which included a seven-point system that required documenting and quantifying hazardous trees with a rating system. *Id.* at 488. A government worker, following this seven-point system, failed to remove the tree that ended up killing the children. *Id.* at 488–89. The court noted that "[r]egardless of the policy considerations that went into the choice to adopt the system, the *implementation* of such system cannot be said to turn on those same considerations." *Id.* (emphasis in original). The court therefore found that the worker's failure to remove the tree at issue was not protected by the discretionary function exception. *Id.* at 490–91. Coming to this decision, the panel reasoned that park workers inspecting trees were not making policy choices given the application of specialized knowledge and professional judgment making this decision. *Id.* at 489. The court concluded that "once Park officials undertook to evaluate the danger of the trees in the campground, they were required to do so according to the technical criteria set forth in the Park's official policies." *Id.*

The parties also addressed two more recent Ninth Circuit cases on this issue at oral

argument—*Lam v. United States*, 979 F.3d 665 (9th Cir. 2020) and *Nanouk v. United States*, 974 F.3d 941 (9th Cir. 2020). (Doc. 26.) In *Lam*, the plaintiff was asleep in a recreational area when a tree crashed into his tent and crushed his foot. 979 F.3d at 670. During this time, the government employed a worker in this area who was trained "to identify and remove hazardous trees" based on certain factors that would signal a threat. *Id.* at 670–71. This worker inspected the tree at issue "before it fell, but he never saw any reason to believe that it was dangerous." *Id.* at 671. A divided Ninth Circuit panel found the decision whether to remove the tree protected by the discretionary function exception. *Id.* at 682. As to whether this decision implicated policy analysis, the court noted that "social and political policy questions, maximizing aesthetics, and conserving natural resources inevitably become competing interests." *Id.* Thus, the "[c]ompeting interests and policy concerns" required discretionary balancing and weighing, which immunizes the government from suit in this situation.[5] *Id.*

In *Nanouk*, the plaintiff sued the United States when she alleged that her property was "contaminated by hazardous chemicals negligently released from the site of a nearby military facility." 974 F.3d at 942. The plaintiff asserted three negligence theories against the government: failing to remediate and dispose of the toxic chemicals while the government operated the station at issue, shutting down the military facility and allowing toxic barrels leak into the soil, and failing to clean up a 13-year-old hotspot. *Id.* at 945–50. The court found the first two theories protected by the discretionary function exception because the government's decisions on the disposal of the toxic chemical and the abandonment of the station were discretionary actions. *Id.* As to the second prong of the discretionary function exception, the court concluded that the first two negligence

---

[5] Judge Hurwitz dissented. *Id.* at 687–88. He noted that "*Kim* should control" the court's analysis because "[d]eciding whether a tree is diseased and poses a danger to campers, like deciding when mold should be removed, 'involves professional and scientific judgment, not decisions of social, economic, or political policy.'" *Id.* at 689 (citation omitted). Judge Hurwitz stated that "[h]aving voluntarily undertaken the task of inspecting trees on its property to keep campers on its property safe, the government should not escape liability for its alleged negligence by casting a camper's injury as the result of a policy decision." *Id.* Even if Judge Hurwitz's position was in the majority, it would not apply here because the Forest Service provided no specific or technical mandate that flash flood signage be placed at the Water Wheel site.

theories turned on issues of supervision, inspections, and competing policy considerations, such as "the need to address simultaneous and more urgent safety concerns presented by environmental contamination at sites assigned a higher priority ranking," which are intertwined in social, economic, and political policy. *Id.* The court, however, found that the government had not "made any factual showing" whether its failure to discover and remediate the contamination sooner was susceptible to policy analysis and remanded on that issue. *Id.* at 949–50.

The Court is persuaded that the discretionary function exception applies here. The government has provided sufficient evidence to prove its discretionary action to place flash flood signs in certain areas of the national park is susceptible to policy analysis. The Forest Service had to consider multiple policy-driven factors, such as how to allocate funding and human resources among competing priorities. (Doc. 20-4 at 4–5.) This economic factor balanced the expense of sign installations and maintenance with future Forest Service objectives. (*Id.*) The government also had to weigh the risks associated with the proliferation of hazard signs around the national forest. (*Id.*) The Forest Service's decision to place flash flood signs in certain locations also involved the weighing of competing policy and safety considerations, which is protected by the discretionary function exception. *See Nanouk*, 974 F.3d at 945–50. The BAER Report expressly weighed competing policy considerations of which safety measures to take in an expedited fashion, including where to place flash flood hazard signs. (Doc. 20-5 at 25–45.) While the BAER Report recommended the Forest Service provide two additional flash flood signs at roads miles away from the Water Wheel area, there was no directive that the Forest Service place flash flood signs at the Water Wheel site itself. Forest Service officials made policy decisions when deciding to prioritize certain safety risks over others or where to allocate emergency funding. (*Id.*)

The Court agrees with the United States that *Kim* is distinguishable. (Doc. 24 at 4.) Unlike the seven-point system in *Kim*, there are no facts suggesting that the Forest Service was bound under a specific, technical system to evaluate where to place flash

flood signs. As the court in *Lam* recognized, when the government is balancing multiple policy-driven factors without a specific system in place to instruct its decision-making process, the government will be protected by the discretionary function exception. Here, the Forest Service was doing just that, considering several policy-driven factors while trying to balance safety decisions in the aftermath of a natural disaster.

The Court lacks subject matter jurisdiction over the Garcias' first negligence theory because the discretionary function exception applies to the Forest Services' decision regarding flash flood warning sign placement. The Court therefore grants the Motion as to the Garcias' first theory of liability, that is, whether the Forest Service failed to warn visitors with flash flood signage at the Water Wheel area.

### B.    Private Party Analogue

Evident from 28 U.S.C. §§ 2674 and 1346(b)(1), the FTCA encompasses only those claims which possess a state-law private party analogue. *See Myohanen v. United States*, No. CV-19-05866-PHX-JJT, 2020 WL 6063294, at *5 (D. Ariz. Oct. 14, 2020). The Court must therefore "analogize the government to a private actor in a similar situation and apply state law to determine amenability to suit and substantive liability." *LaBarge v. Mariposa Cnty.*, 798 F.2d 364, 366 (9th Cir. 1986). The United States argues here that it cannot be liable under any of the Garcias' negligence theories because of Arizona's recreational use statute. *See Wilson v. United States*, 909 F.2d 953, 955–56 (8th Cir. 1993) ("[T]he United States is entitled to the benefit of state recreational use statutes, if applicable, when it is sued under the Federal Tort Claims Act."). Arizona's recreational use statute provides in part that "[a] public or private owner, easement holder, lessee, tenant, manager or occupant of premises is not liable to a recreational or educational user." A.R.S. § 33-1551(A). The parties agree that the Garcia family members were "recreational users" under the statute, insofar that they were hiking, swimming, and engaging in other recreational pursuits. *Id.* § 33-1551(C)(5).

The parties contest whether two exceptions to the recreational use statute apply. Those two exceptions allow liability when a landowner: (1) charges the person entering

the land an admission or entry fee, excluding nominal fees; or (2) "was guilty of willful, malicious or grossly negligent conduct that was a direct cause of the injury to the recreational or educational user." *Id.* §§ 33-1551(A), (C)(5).

### 1.      Fee Charged Exception

The United States acknowledges that the Garcias paid $9.00 for each of their three vehicles when they entered the Water Wheel area, but contend that this fee "was a use fee for developed sites and not a general entry fee to the forest." (Doc. 20 at 11.) Because this was only a "use fee" and not an "admission fee" or "entry fee," the United States concludes that it is immune from all of the Garcias' simple negligence theories on this basis. (*Id.*) The Garcias respond that "[t]he fee was indisputably consideration which the Garcia family was required to pay in exchange for permission to enter the premises with their vehicles." (Doc. 23 at 11.) To evaluate these arguments, the Court must first look to the language of the statute at issue. *See Howard v. United States*, 181 F.3d 1064, 1070 (9th Cir. 1999) ("The interpretation of the various recreational use statutes is controlled by the precise language of each statute.") (citation omitted).

Under Arizona's recreational use statute, a government entity will not have immunity if a recreational user has provided "payment of an admission fee or any other consideration to travel across or to enter premises." A.R.S. § 33-1551(C)(5). Courts have identified two categories of statutes that are often used in state recreational use statutes: (1) "charge" or "fee" statutes and (2) "consideration" statutes. *See Howard*, 181 F.3d at 1068–70 (collecting cases). Under "charge" or "fee" statutes, "most courts have declined to apply the exception to immunity unless an actual fee has been charged by the landowner for entry onto the land." *Id.* at 1068. "Under the consideration statutes, almost any form of benefit to the landowner will act to trigger the immunity exception." *Id.* at 1069. Arizona's recreational use statute more closely mirrors a "consideration" statute. The statute explicitly provides for "any other consideration." A.R.S. § 33-1551(C)(5). Indeed, other courts have found that recreational use statutes using the term "consideration" is "far more encompassing" than more narrow terms, such as "fee" or

1   "charge." *Ducey v. United States*, 713 F.2d 504, 510 (9th Cir. 1983). The statute's

2   express language reflects the legislature's intent that using the term "consideration"

3   applies broadly and encompasses activities like the Garcias' payment.

4         The United States relies on two cases, *Jones v. United States*, 693 F.2d 1299 (9th

5   Cir. 1982) and *Howard*, 181 F.3d at 170, and a sign posted at the Water Wheel's kiosk to

6   contend that its reading of the statute should govern.[6] (Doc. 20 at 10–11.) In *Jones*, the

7   court analyzed Washington's recreational use statute, which was a "charge" or "fee"

8   statute, to determine whether the plaintiff, who was injured while snow tubing, could

9   recover from the government. 693 F.2d at 1303. The court determined that the

10  government was immune from suit under this statute because the fee paid to a third-party

11  concessionaire to rent the inner tube was not a charged fee to enter or use the

12  government's land. *Id.* at 1303–04. Similarly, in *Howard*, the court analyzed a Hawaii

13  "charge" or "fee" recreational use statute. 181 F.3d at 1070. The court found the

14  government immune from suit because it "did not charge anyone for the use of its

15  facility" and the plaintiff, in fact, paid a private company for the activity that led to his

16  injury. *Id.* at 1070–71.

17        The United States' reliance on these cases are misplaced. Both *Jones* and *Howard*

18  dealt with "charge" or "fee" statutes, rather than the consideration statute here. Both

19  cases also dealt with situations in which the plaintiff was not charged a fee to use the

20  government's land at all. Here, however, the Garcias paid consideration to enter the

21  Water Wheel site and use the surrounding area.[7] The "use fee" highlighted in the kiosk's

22  poster required visitors to pay before using the "recreation site" or face "criminal"

23

24  _____

    [6] The sign posted at the Water Wheel's kiosk provides that "[u]se fees are required at

25  many Forest Service recreation sites. Visitors must pay the posted use fee to an attendant
    or by a 'fee envelope' . . . prior to using [the] recreation site. Failure to pay the use fee is
    a criminal offense and subject to prosecution under State Law." (Doc. 20-6 at 9.)

26  [7] The Forest Service's sign posted at the Water Wheel's kiosk makes evident that this
    consideration applied to any visitor, whether that be someone arriving in a vehicle to use

27  the Water Wheel site or a person on foot looking to use the Water Wheel's bathrooms or
    picnic tables. (Doc. 20-6 at 9.) The United States agrees that this fee applied to any

28  visitor using the Water Wheel area and only certain individuals are exempted from
    paying this fee, such as those with annual passes. (Doc. 24 at 4–5.) This fee applied to the
    Garcias, who used the Water Wheel recreation area. (Doc. 17 ¶ 40.)

prosecution. This case does not involve a payment to a third-party concessionaire for an inner tube or a payment to a private party that was not related to the use of government land as in *Jones* and *Howard*. The government does not dispute that the Garcias paid a fee to use the Water Wheel recreation site. The cases that the United States relies on hold that a use fee is sufficient to invoke a recreational use statute's immunity waiver, especially when the fee is governed by a consideration statute. The Garcias payment was therefore a fee paid under the statute's plain meaning and the United States will not be immune under the recreational use statute unless this fee was nominal.

The Arizona recreational use statute provides that "[a] nominal fee that is charged by a public entity or a nonprofit corporation to offset the cost of providing the educational or recreational premises and associated services does not constitute an admission fee or any other consideration." A.R.S. § 33-1551(C)(5). Arizona state courts have noted that "[t]he legislature has not defined 'nominal' for purposes of the recreational-use statute." *MacKinney v. City of Tucson*, 231 Ariz. 584, 591 (App. 2013). These courts look to dictionaries to aid their interpretation, which define "nominal" as "insignificantly small" or "trifling, especially as compared to what would be expected." *Id.* (citations omitted). Regardless of the exact definition, the parties agree that this is a very small amount in comparison to what something's value is actually worth. (Doc. 20 at 11; Doc. 23 at 12.)

The parties dispute whether the $9.00 fee for each of the three vehicles was a nominal payment. In this case, the fee equates to $1.80 per person. (Doc. 20 at 11.) The United States relies on *Allen v. Town of Prescott Valley*, 244 Ariz. 288 (App. 2018), to show that similar fees have been construed as nominal, especially given the costs offset other operating, maintaining, or improving fees. The United States also provides declarations noting that the fees collected here were applied toward operation and maintenance for several picnic sites. (*See, e.g.*, Doc. 20-2 ¶¶ 7–9, 16–17.) The Garcias point to *MacKinney*, which noted that whether a fee was nominal "is a mixed question of law and fact that may require additional findings." 231 Ariz. at 591. The court in

*MacKinney* remanded the case for the trial court to determine "whether the fee was a nominal fee," as this question "can be answered only through a fact-specific inquiry." *Id.* The Garcias contend that *MacKinney* shows that it is premature to answer whether the $9.00 fee was nominal at this time. (Doc. 23 at 12–13.)

The Court agrees with the Garcias. Although the United States' arguments on whether this fee is nominal may ultimately prevail, it is too soon to conclude that the $9.00 fee is nominal. Though the United States has provided evidence that this fee was offset by other costs, the Garcias are entitled to test this theory through discovery. Tellingly, the only case that the United States cites on this issue was decided at the summary judgment stage, after discovery had occurred. *See Allen*, 244 Ariz. at 289. The United States cites no other cases to suggest that answering this fact-intensive question at this stage is appropriate. The Court will therefore allow limited discovery. The Court will deny the Motion without prejudice as to the three remaining simple negligence claims. The United States may reassert this argument in a later motion to dismiss.

### 2.     Willful, Malicious, or Grossly Negligent Conduct Exception

Arizona's recreational use statute also strips the government's immunity if it "was guilty of willful, malicious or grossly negligent conduct that was a direct cause of the injury to the recreational or educational user." A.R.S. § 33-1551(A). The statute defines "grossly negligent" to mean "a knowing or reckless indifference to the health and safety of others." *Id.* § 33-1551(C)(2). As the United States notes, Arizona state courts find that a defendant is grossly negligent only if "he knows or has reason to know facts which would lead a reasonable person to realize that his conduct not only creates an unreasonable risk of bodily harm to others but also involves a high probability that substantial harm will result." *Walls v. Ariz. Dep't of Pub. Safety*, 170 Ariz. 591, 595 (App. 1991). Although the statute does not define "willful" or "malicious," courts have defined these terms as "intentional, wrongful conduct, done either with knowledge that serious injury to another probably will result or with a wanton and reckless disregard of the possible results." *S. Pac. Transp. Co. v. Lueck*, 111 Ariz. 560, 563 (1975). Arizona

state courts have clarified that gross negligence and willful or malicious conduct are "treated as one and the same" in many situations. *Williams v. Thude*, 188 Ariz. 257, 259 (1997).

The United States argues that the Garcias have failed to establish "jurisdictional facts that the United States' conduct was 'willful, malicious or grossly negligent.'" (Doc. 20 at 12–17.) The United States points to remaining three gross negligence theories (1) failure to relay the NWS to park visitors, (2) failure to close the Water Wheel or Cold Spring areas, and (3) failure to remove debris jams and other floatable debris identified by the Forest Service, to contend that no facts suggest that the government could be liable under any theory. (*Id.*) The Garcias respond that the United States "seeks a dispositive ruling on a highly fact-intensive inquiry, where no discovery has been done, and where Plaintiffs have had no opportunity to request documents or depose witnesses." (Doc. 23 at 13.) In any event, the Garcias contend that there are disputed materials facts with each negligence theory that can be dealt only with on a more fully developed record. (*Id.* at 13–16.) The Garcias therefore ask this Court to "allow the parties to proceed to discovery going to both the jurisdiction issues and the merits" because "there are significant facts in dispute about the extent of the Forest Service's knowledge, whether it reasonably should have anticipated the danger to visitors, and whether it was negligent or grossly negligent for failing to warn, close the area, or otherwise mitigate the risk to unsuspecting swimmers." (*Id.* at 17.)

The United States cites several cases to support its arguments that it cannot be liable for gross negligence on any theory.[8] Notably, each of these cases proceeded to summary judgment. The United States' failure to cite a case with a similar procedural posture to this instant case makes sense because "where the jurisdictional issue and the substantive issue are so intertwined that the question of jurisdiction is dependent on

---

[8] The United States cites: *Wringer v. United States*, 790 F. Supp. 210 (D. Ariz. 1992); *Dickey ex rel. Dickey v. City of Flagstaff*, 205 Ariz. 1 (2003); *Armenta v. City of Casa Grande*, 205 Ariz. 367 (App. 2003); *Grant v. Wakeda Campground, LLC*, 631 F. Supp. 2d 120 (D.N.H. 2009); and *In re Aramark Sports & Entm't Servs., LLC*, 831 F.3d 1264 (10th Cir. 2016). (Doc. 20 at 12–17.)

factual issues going to the merits, the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial." *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983). When these issues are intertwined, "the jurisdictional determination should await a determination of the relevant facts." *Id.* Courts therefore decline to dismiss cases at this stage of the litigation—where there has been no discovery—to better understand the disputed jurisdictional and substantive issues. *See, e.g.*, *Young v. United States*, 769 F.3d 1047, 1052–53 (9th Cir. 2014) (holding that the plaintiffs' "complaint should not have been dismissed" at the 12(b)(1) stage because "the Park Service's knowledge of the hazard . . . should have awaited a determination on the merits").

Even though the Court must accept as true the factual allegations in the complaint at this stage of the proceedings, *see Kim*, 940 F.3d at 490, the Garcias' First Amended Complaint does not provide an adequate basis for this Court to evaluate whether the jurisdictional and substantive issues are so intertwined. The First Amended Complaint asserts many allegations that the Forest Service and its employees had knowledge of, or were reckless in failing to identify, many dangers that allegedly should have been fixed or at least warned about. (*See, e.g.*, Doc. 17 ¶¶ 26, 29, 30, 62, 73, 75.) The First Amended Complaint, however, does not properly set forth its gross negligence theory. The Garcias' gross negligence theory is conflated with their simple negligence claim. (Doc. 17.) Given that the Garcias' gross negligence theory has not been parsed out, the First Amended Complaint does not contain the required level of specificity to plead that separate cause of action. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The result of what the First Amended Complaint provides are legal conclusions that the Forest Service was recklessly, willfully, or grossly negligent in its conduct. This Court is not required "to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Federal Rule of Civil Procedure 15(a) provides that leave to amend should be freely granted "when justice so requires." Fed. R. Civ. P. 15(a)(2). "The power to grant

leave to amend . . . is entrusted to the discretion of the district court, which 'determines the propriety of a motion to amend by ascertaining the presence of any of four factors: bad faith, undue delay, prejudice to the opposing party, and/or futility.'" *Serra v. Lappin*, 600 F.3d 1191, 1200 (9th Cir. 2010) (quotation omitted). "Generally, this determination should be performed with all inferences in favor of granting the motion." *Griggs v. Pace Am. Grp., Inc.*, 170 F.3d 877, 880 (9th Cir. 1999). As to the gross negligence theories, the Motion will be granted and the Garcias will have leave to amend.

**IV.    CONCLUSION**

Accordingly,

**IT IS ORDERED granting in part** and **denying in part** the United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. 20) as follows:

1.    The Garcias' first negligence theory, failure to warn visitors with flash flood signage, is dismissed with prejudice for lack of subject matter jurisdiction.

2.    The United States' Motion to dismiss the simple negligence theories is denied without prejudice and may be refiled. Plaintiffs are permitted limited jurisdictional discovery on the nominal fee issue. The Court will allow the Garcias until May 3, 2021 to conduct this limited discovery. The Garcias may amend their complaint to include additional jurisdictional facts on this issue.

3.    The United States' Motion as to the Garcias' gross negligence theories is granted for failure to state a claim, with leave to amend.

**IT IS FINALLY ORDERED** that the Garcias shall file their amended complaint, if they choose to do so, no later than May 13, 2021.

Dated this 18th day of March, 2021.

*Michael T. Liburdi*

Michael T. Liburdi
United States District Judge